BACHARACH, Circuit Judge,
concurring.
I join Parts I, II, III, IV, V, and VI(B)(1) of Judge Tymkovich’s thorough, finely-crafted opinion. Like Judge Tymkovich, I believe that Hobby Lobby Stores, Inc. and Mardel, Inc. are “persons” under the Religious Freedom Restoration Act. I write separately to:
• discuss the need for a remand so that the district court can address the balancing elements of the preliminary-injunction inquiry and
• address prudential standing and conclude that we should instruct the district court to dismiss the Greens’ claims.
I. The Need for Remand to the District Court on the Balancing Elements
I respectfully decline to join Parts VI(A), (B)(2), and (B)(3) of the plurality opinion because I believe that the required balancing of interests should be conducted by the district court rather than the court of appeals. Because we convene as an appellate tribunal, rather than a front-line court of equity, our only function is to determine whether the district court committed legal error.
The district court did err, as the plurality concludes, by holding that Hobby Lobby and Mardel are unlikely to succeed on the merits. Still, Hobby Lobby and Mardel can obtain a preliminary injunction only if they persuade a court of three additional elements: (1) irreparable injury; (2) avoidance of injury to the public interest; and (3) greater injury to themselves, if a preliminary injunction were to be denied, than to the defendants if a preliminary injunction were to be granted. See Plurality Op., Part VI; see also Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) (identifying the equitable elements for a preliminary injunction). These elements have not been addressed by the district court.
I agree with the plurality that Hobby Lobby and Mardel have demonstrated ir *1160 reparable injury, for the government argued in the district court that the elements involving irreparable injury and likelihood of success had merged.
The remaining issue is whether the district court should be allowed to engage in the balancing required by the other two elements or whether, as the plurality proposes, we should undertake that task ourselves. Unlike the plurality, I think the equitable balancing should be performed by the district court.
As the Supreme Court has recognized, “the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts.” eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 394, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). Thus, when a district court has not addressed one or both of the balancing elements because of a legal error involving some other part of the inquiry, the general practice is to remand the case to the district court for initial consideration of the public interest and balancing of the potential harm to the parties.[1] Our court ordinarily follows this practice. See Kikumura v. Hurley, 242 F.3d 950, 963 (10th Cir.2001) (remanding for consideration of the public interest and balancing of interests because the district court had not discussed them).
The reasons for this practice are sound. As the Seventh Circuit Court of Appeals observed, the “cold record” before the appellate court may not reflect the district judge’s sense of the equities. Lawson Prods., Inc. v. Avnet, Inc., 782 F.2d 1429, 1437-38 (7th Cir.1986). Thus, it is hard to imagine why an appellate tribunal would be better than the district court at balancing the relevant interests. Id.
Now that we have decided the issues of likelihood of success on the merits and irreparable harm, a court must weigh the competing equities, such as the public interest in ensuring access to emergency contraceptives and the interests of Hobby Lobby and Mardel in exercising their religious beliefs. In my view, this weighing process is more properly suited to the institutional expertise and function of the district court.
In its own weighing of interests, the plurality does not mention the public interest that the government had relied on at the preliminary-injunction hearing: the health reasons for promoting employee access to emergency contraceptives. JA 158a. A court of equity might ultimately decide that this interest is outweighed by the public interest in extending RFRA protection to Hobby Lobby and Mardel. But whichever court does the balancing must at least consider the government’s stated interest and weigh it against the public interest in religious freedom.
As Judge Tymkovich notes, we have occasionally balanced the equities in the first instance when “the record is sufficiently developed to allow for an analysis of the equitable factors on appeal.” Westar Energy, Inc. v. Lake, 552 F.3d 1215, 1224 *1161 (10th Cir.2009); see Plurality Op., Parts IV, VI. But here, the record does not contain any evidence. Thus, I do not believe the record was sufficiently developed for us to do the balancing in the first instance.
The plurality suggests that balancing of statutory public interests is unnecessary because: (1) RFRA supersedes other statutes, and (2) rights under RFRA should be treated as if they are constitutional rights. I respectfully disagree. Public interests can arise from non-statutory sources, and the rights under RFRA and the Constitution are distinct.
First, public interests are found in a variety of places, often outside of statutes. See, e.g., Stormans, Inc. v. Selecky, 586 F.3d 1109, 1139 (9th Cir.2009) (discussing the public interest in ensuring access to “Plan B” for sexually active women of childbearing age without citing statutes that support that interest). Thus, even if a court of equity were to find that the public interest in RFRA always outweighs other statutory interests, it could also find that the non-statutory public interest in access to emergency contraceptives outweighs the public interest under RFRA for Hobby Lobby and Mardel to exercise religion.
Second, RFRA and the First Amendment are distinct and the scope of the protections are different. And when we address the likelihood of success, we are doing so in the context of the RFRA claims — not the constitutional claims.
In an effort to equate RFRA and the First Amendment, the plurality relies on Kikumura v. Hurley, 242 F.3d 950 (10th Cir.2001). But Kikumura compared RFRA to the Constitution in the context of only one equitable element: irreparable injury. Kikumura v. Hurley, 242 F.3d at 963. In that context, we simply applied the general rule that an injury is irreparable when the court would be unable to grant an adequate remedy at law. Id. With regard to the remaining equitable elements, however, we declined to conduct the initial balancing of the public interests and the equities. Id. Instead, we remanded for the district court to consider the applicable public interests even if the plaintiff were to show likelihood of success on the merits. Id. Thus, Kikumura does not support balancing of the public interests and equities on appeal even when the plaintiff is likely to succeed under RFRA. Indeed, by remanding in Kikumura, we did precisely the opposite of what the plurality would have us do here.
In urging that we allow the district court to balance the remaining elements, I am mindful of the time pressures on the courts — and on Hobby Lobby and Mardel — as the deadline of July 1, 2013, approaches. Still, I do not think these time pressures should induce us to step outside of our institutional limits and usurp a role better suited to the district court.
II. The Greens’ Standing to Sue in their Personal Capacities
In footnote 4, the plurality opinion states that we need not address the Greens’ standing. I believe, however, that we should do so. In addressing the Greens’ standing, we should consider whether Congress abrogated prudential restrictions in RFRA and, if not, whether the Greens’ alleged injuries derive solely from the injuries sustained by Hobby Lobby and Mardel.
In my view, Congress did not abrogate prudential-standing restrictions in RFRA, and the Greens’ claims derive solely from the alleged injuries sustained by Hobby Lobby and Mardel. As a result, I would direct the district court to dismiss the Greens’ claims based on the shareholder-standing rule.
*1162 A. Waiver
Prudential-standing limitations are subject to waiver. See Finstuen v. Crutcher, 496 F.3d 1189, 1147 (10th Cir.2007). But this court has discretion to address prudential standing sua sponte. Adams ex rel. D.J.W. v. Astrue, 659 F.3d 1297, 1299-1301 (10th Cir.2011) (addressing a prudential-standing restriction sua sponte). We should invoke this discretion here, for we have raised the issue, obtained briefs on the parties’ positions, and learned that the Defendants object to the Greens’ claims based on prudential-standing limitations.
B. Abrogation by Congress
If this Court were to address standing, we would need to consider whether Congress abrogated prudential-standing limitations in RFRA. The Greens argue that Congress abrogated these limitations by stating that standing under RFRA “shall be governed by the general rules of standing under article III of the Constitution.” 42 U.S.C. § 2000bb-l(c) (2006). In my view, this language does not eliminate prudential-standing restrictions.
The restrictions apply unless they are expressly abrogated by Congress. Bennett v. Spear, 520 U.S. 154, 163-64, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). In § 2000bb-l(c), Congress never mentioned prudential restrictions or said that the standing rules under Article III would be exclusive. Instead, Congress simply said that Article III would govern standing issues under RFRA. At best, this language is ambiguous regarding Congress’s intent to modify prudential-standing rules.
Notwithstanding the potential ambiguity in the text, Congress clarified its intent in the legislative history. There Congress stated that the language in RFRA is designed only to preserve the existing body of case law on article III limitations when taxpayers sue to challenge the tax-exempt status of religious institutions. See S.Rep. No. 103-111, at 12-13 (1993), reprinted in 1993 U.S.C.C.A.N. 1892, 1902-03; H.R. Rep. 103-88 (1993), 1993 WL 158058. Though Congress rarely includes language solely to emphasize its intention to keep standing limitations, “that appears to be precisely what Congress did here.” Jackson v. District of Columbia, 254 F.3d 262, 267 (D.C.Cir.2001). Indeed, in explaining the cited statutory language, the House Judiciary Committee noted that “[t]he Act would not provide a basis for standing in situations where standing to bring a free exercise claim is otherwise absent.” H.R. Rep. 103-88 (1993), 1993 WL 158058. As a result, I do not believe that Congress has expressly abrogated the prudential-standing requirements through RFRA.
C.Application of the Shareholder-Standing Rule
With this conclusion, I believe we should instruct the district court to dismiss the Greens’ claims under the shareholder-standing rule.
One prudential limit on standing is the general restriction against asserting the legal rights and interests of third parties. See, e.g., Warth v. Seldin, 422 U.S. 490, 499-500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). This restriction frequently applies when shareholders bring claims deriving solely from their relationship to the corporation. In such situations, courts generally apply the “shareholder-standing rule,” which “prohibits shareholders from initiating actions to enforce the rights of the corporation unless the corporation’s management has refused to pursue the same action for reasons other than good-faith business judgment.” Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd,., 498 U.S. 331, 336, 110 S.Ct. 661, 107 L.Ed.2d 696 (1990). This rule is designed to “limit access to the federal courts to those litigants best suited to assert a particular *1163 claim.” Gladstone Realtors v. Bellwood, 441 U.S. 91, 100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979).
But sometimes shareholders and their corporations suffer distinct injuries. In these cases, courts have carved out an exception to the shareholder-standing rule, allowing shareholders to sue when they have “a direct, personal interest in a cause of action.” Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd., 493 U.S. 331, 336, 110 S.Ct. 661, 107 L.Ed.2d 696 (1990). Thus, the issue of standing turns on whether the Greens claim an injury from the Affordable Care Act that is direct and personal or merely derivative of the injury to Hobby Lobby and Mardel.
In my view, the Greens’ injury stemming from the Affordable Care Act is purely derivative of the corporations’ injury. The mandate does not require anything of the Greens; the obligation falls solely on the corporations.
In oral argument, the Greens argue that they incurred a direct injury from their duty to implement the contraceptive mandate for Hobby Lobby and Mardel. But the Greens are implementing these decisions as officers and directors of the corporations, not as individuals acting in their personal capacities.
The Greens must subordinate their own religious beliefs to fulfill their fiduciary duties under Oklahoma law as officers and directors of Hobby Lobby and Mardel. See Fields v. Victor Bldg. & Loan Co., 73 Okla. 207, 175 P. 529, 531 (1918) (per curiam). As fiduciaries, the Greens must implement corporate decisions by setting aside their own religious beliefs and advancing the best interests of the corporations. See id.
In advancing the best interests of Hobby Lobby and Mardel, the Greens face a difficulty because the mandate creates conflicting interests for Hobby Lobby and Mardel: the financial interest in complying with the mandate and the religious interest in not covering insurance for certain contraceptives. But this Hobson’s choice falls solely on the two corporations, and the Greens’ injury is not directly or personally created by the Affordable Care Act. Instead, the Greens’ injury stems derivatively from their fiduciary duties under Oklahoma law to advance the conflicting financial and religious interests of Hobby Lobby and Mardel. As a result, I do not believe the Greens can avoid the shareholder-standing rule based on a “direct” or “personal” injury created by the Affordable Care Act.
Accordingly, I would remand with instructions to dismiss the Greens’ claims for lack of prudential standing under the shareholder-standing rule.

. See eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 394, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006) (vacating the decision of the court of appeals and ordering a remand so that the district court could address the equitable elements of a preliminary injunction); Acumed LLC v. Stryker Corp., 483 F.3d 800, 811 (Fed. Cir.2007) (remanding a case to the district court and explaining that "[i]f we were to weigh the evidence ourselves to reach a conclusion on injunctive relief, we would effectively be exercising our own discretion as if we were the first-line court of equity,” a role belonging “exclusively to the district court”); Lawson Prods., Inc. v. Avnet, Inc., 782 F.2d 1429, 1437-38 (7th Cir.1986) (remanding to the district court for consideration of the equitable elements of a preliminary injunction because “the appellate process is not well suited to an appreciation of the subtle shadings of a case” involved in the balancing of equities).